THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SECURITIES AND EXCHANGE :
COMMISSION, :
 :
 Plaintiff, :
v. : 1:17-CV-464
 : (JUDGE MARIANI)
MATTHEW A. KRIMM, et al., :
 :
 Defendants. :

## MEMORANDUM OPINION

### I. INTRODUCTION

Presently before the Court is Plaintiff Securities and Exchange Commission's ("SEC's") Motion for Entry of Default Judgment (Doc. 9). For the reasons discussed below, the Court will grant the SEC's motion.

### II. PROCEDURAL HISTORY AND FACTUAL BACKGROUND

On April 25, 2017, the SEC filed a Complaint against Defendants Matthew A. Krimm ("Krimm") and his company, Krimm Financial Services, LLC ("KFS") (collectively, "Defendants"), seeking injunctive relief, disgorgement of ill-gotten gains, an award of prejudgment interest, and civil penalties for an alleged mortgage business investment scam. (Doc. 1). Defendants waived service of the Complaint. (Doc. 3, Doc. 4). Defendants never responded to the Complaint, and the SEC moved on September 7, 2017 for the Clerk of Court's entry of default, which was entered that same day. (Doc. 5, Doc. 6). The case was later assigned to this Court, and the SEC moved for entry of default judgment on June 8,

2018. (Doc. 9). On February 14, 2019, the SEC informed the Court that Krimm pled guilty in November 2018 to securities fraud and theft in a related criminal matter brought against him by the Delaware Department of Justice and that he is expected to be sentenced in the spring of 2019. (Doc. 14).

The SEC's allegations in the Complaint, which the Court accepts as true in the absence of any response from Defendants, include the following:

> During the relevant period, Krimm owned, operated, and controlled KFS.
>
> From at least May 2012 through January 2014, Krimm and KFS fraudulently induced more than 25 investors, located in multiple states, including Delaware, Maryland, and Pennsylvania, to purchase at least $1.69 million in unregistered securities by falsely promising to use investor funds for KFS's purported mortgage business, and by making numerous other material misstatements and omissions.
>
> Krimm marketed the securities in telephone calls, electronic mail, and face-to-face meetings with prospective investors, targeting customers of licensed mortgage lenders that had employed Krimm, including Lender 1 [a licensed mortgage lender based in Maryland at which Krimm worked as a loan officer from March 2012 until April 2013]. Many of the investors were financially unsophisticated with limited investment experience. Investors did not have access to the kind of information and level of detail that would be in a registration statement.
>
> The securities that Krimm sold to investors took the form of "promissory notes," in which Krimm and/or KFS promised investors that they would receive interest payments as well as the return of their principal. Although the notes varied in form, they were substantially similar, and all of the investors were told that investor funds would be used for the purpose of expanding KFS's purported business.
>
> Krimm solicited investors to purchase the securities using several different sets of written offering documents that he authored. The offering documents referred to the promissory notes as an "investment opportunity," and

2

described KFS's purported mortgage business and the proposed terms of the offering.

Krimm and KFS stated in the offering documents that investors would receive interest, and, in some cases, also "profit sharing" or "additional bonus" payments. These payments varied based upon the length or amount of the investment.

Investors made payments of money to Krimm and/or KFS and, in exchange, received a promissory note signed by Krimm on behalf of himself, and/or KFS. Regardless of whether the promissory notes were issued solely in Krimm's name or in the name of KFS, Krimm told investors that investor funds would be used to finance KFS's purported mortgage business.

Krimm and KFS made material misrepresentations and omissions to investors relating to KFS's business operations, income, revenue, and profitability, as well as the use of investor funds and the source of payments to investors.

In written offering documents distributed to prospective investors to induce them to invest, Defendants falsely stated that:

   a. KFS was licensed to lend in multiple states, ranging in number from nine to 42 states;

   b. KFS owned and/or operated mortgage net branch offices in multiple states, including Delaware and Pennsylvania, and, in some offering documents, also claimed that KFS had offices in Texas, Maryland and/or New Jersey; and

   c. KFS's net branch offices generated at least $10 million in mortgage loans per month, with some offering documents claiming a monthly mortgage loan production of at least $20 million.

Krimm and KFS also provided prospective investors with false and contradictory income statements.

Krimm and KFS provided prospective investors with false and unreasonable revenue and profit projections.

3

Krimm claimed in written offering documents that investor funds would be used for "expansion" of KFS's business with new office locations, to "recruit top level industry veterans" for KFS's offices, and to expand KFS's "reverse mortgage lending" business.

Krimm also made oral representations to investors and prospective investors that investor funds would be used to open new KFS offices, to pay recruiting bonuses for new mortgage loan officers, and to expand KFS's business with respect to reverse mortgage loans.

Contrary to what investors were told in writing and orally, Krimm used over 75% of investor funds in ways not disclosed to investors.

For instance, without disclosing it to investors, Krimm misappropriated over $500,000 of investor funds to benefit himself and his family.

Krimm used investor funds to pay his personal expenses, including, among other things, the rent on his home, personal automobile loan payments, rental car expenses, childcare expenses, household expenses, and frequent purchases at restaurants, and grocery, convenience and department stores.

Krimm spent over $800,000 to make purported interest, profit sharing, additional bonus payments, and principal payments to prior investors. These payments were made to further the fraud by maintaining the appearance that the business was performing as represented.

Krimm did not disclose to investors that he planned to, or did, in fact, use investor money for Krimm's personal benefit, or that he used money from new investors to repay earlier investors.

Krimm and KFS offered to sell and sold the promissory notes when no registration statement was filed with the Commission or in effect as to the promissory notes.

In connection with these sales or offers to sell, Krimm and KFS made use of means or instruments of interstate transportation or communication in interstate commerce or of the mails, including using the internet, interstate phone calls, and the United States mail.

4

> During the period from May 2012 through January 2014, Krimm and KFS continuously sold the promissory notes, and there was no period of six months or more between the promissory sales.
>
> The promissory notes were offered and sold to investors in multiple states, and the offering exceeded $1 million.
>
> The promissory notes were sold to more than 25 unaccredited investors. Krimm and KFS did not distribute audited financial statements to investors prior to the sale of promissory notes.
>
> In connection with the conduct described herein, Defendants acted knowingly, recklessly, or negligently. Among other things, Defendants knew, were reckless, or should have known that they were making material misrepresentations and omitting to state material facts necessary to make certain statements not misleading under the circumstances in connection with the sale or offer of the promissory notes.
>
> Krimm and KFS were the makers of the false and misleading statements made in writing and orally regarding KFS. Krimm signed all of the promissory notes sold to investors, and he prepared the offering documents, income statements, and revenue and profit projections provided to investors on behalf of KFS.
>
> Through their material misrepresentations and omissions, Defendants obtained money or property from investors. Defendants obtained over $1.69 million from investors, of which Krimm misappropriated over $500,000 for himself.

(Doc. 1 ¶¶ 20-24, 28, 31-32, 38, 44, 50-57, 59, 61-65, 67-69). The SEC alleges that Defendants violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") ("First Claim"), 15 U.S.C. §§ 77e(a), 77e(c); Section 17(a) of the Securities Act ("Second Claim"), 15 U.S.C. § 77q(a); and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and the related Rule 10b-5 ("Third Claim"), 17 C.F.R. § 240.10b-5. (Doc. 1 ¶¶ 71-81). The SEC also alleges that the

5

Court has jurisdiction over this action under the federal securities laws and that venue is proper. (*Id.* ¶¶ 8-9).

### III. STANDARD OF REVIEW

Pursuant to the Federal Rules of Civil Procedure, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default". Fed. R. Civ. P. 55(a). Upon the party's request, the clerk of court may then enter default judgment, but only if the claim is for a sum certain or one that can be made certain by computation, the defendant has made no appearance, and the defendant is not a minor or incompetent. *Id.* at 55(b)(1). In all other cases, the party seeking a default judgment must make an application to the court. *Id.* at 55(b)(2).

Although the entry of default judgment is "left primarily to the discretion of the district court", the discretion is not limitless given that cases should "be disposed of on the merits whenever practicable." *Hritz v. Woma Corp.*, 732 F.2d 1178, 1180-1181 (3d Cir. 1984). "Where a court enters a default judgment, 'the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.'" *DIRECTV, Inc. v. Pepe*, 431 F.3d 162, 165 n. 6 (quoting *Comdyne I, Inc. v. Corbin,* 908 F.2d 1142, 1149 (3d Cir. 1990)). "The court's initial inquiry is 'whether the unchallenged facts constitute a legitimate cause of action.'" *Joe Hand Promotions, Inc. v. Yakubets*, 3 F. Supp. 3d 261, 270 (E.D. Pa. 2014) (quoting 10A Charles Alan Wright, Arthur R. Miller, et al., *Federal Practice and Procedure* §

6

2688 (3d ed. 2013)); *accord Pope v. United States*, 323 U.S. 1, 12 (1944). Further, in determining whether to grant a motion for default judgment, a Court must also consider three factors: "(1) prejudice to the plaintiff if default is denied, (2) whether the defendant appears to have a litigable defense, and (3) whether defendant's delay is due to culpable conduct." *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir. 2000) (citing *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 195 (3d Cir. 1984)).

## IV. ANALYSIS

### A. THE ENTRY OF DEFAULT JUDGMENT IS PROPER.

The Court has reviewed the Complaint (Doc. 1) and the SEC's brief in support of its motion for entry of default judgment (Doc. 10) and supporting declarations (Doc. 11, Doc. 12) and finds that the entry of default judgment against Defendants is warranted, as the SEC has sufficiently shown that Defendants have violated federal securities laws and each of the *Chamberlain* factors, *Chamberlain*, 210 F.3d at 164, is satisfied. Further, in making this determination, the Court finds that the declaration of Jacquelyn D. King, Staff Accountant in the Division of Enforcement in the Philadelphia Regional office of the SEC (Doc. 11), together with the declaration's supporting attachments, presents competent, complete, credible and substantial evidence to support this Court's entry of judgment by default against Defendants as well as the specific remedies sought by the SEC and granted by this Court.

7

The SEC has established that the Court has jurisdiction over this matter and that Defendants violated federal securities laws. Specifically, the SEC's Complaint alleges that Defendants conducted unlawful sales of unregistered securities because the promissory notes Defendants sold or offered for sale were required to be registered with the SEC and Defendants made material misrepresentations or omissions to potential investors or otherwise defrauded them in violation of the Securities Act and the Exchange Act and the associated Rule 10b-5.

The SEC's First Claim is that Defendants violated Sections 5(a) and 5(c) of the Securities Act. These legal provisions prohibit the offering for sale or sale of unregistered securities that are required to be registered with the SEC. 15 U.S.C. §§ 77e(a), 77e(c). Promissory notes are typically considered securities and must be registered with the SEC. 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10); *see also Reves v. Ernst & Young*, 494 U.S. 56, 60-61, 64-65 (1990) (noting broad definition of "security" in the Securities Act and Exchange Act and that notes are presumed to be securities); *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 187 (3d Cir. 2000) (investment contracts in a common enterprise seeking profits solely from the effort of others are securities) (citing *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1944)). The Complaint alleges that the promissory notes sold or offered for sale by Defendants are securities that required registration statements from the SEC, the promissory notes were not registered with the SEC, and the promissory notes were not otherwise exempt from registration. (Doc. 1 ¶¶ 20-24, 28, 59, 71-75).

The SEC's Second and Third Claims are that Defendants violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and the associated Rule 10b-5, 17 C.F.R. § 240.10b-5. As the SEC correctly details in its brief in support of its motion for default judgment, establishing violations of these laws requires a showing that Defendants:

> (1) made a material misrepresentation or omission or used a fraudulent device; (2) in the offer and sale of any securities (Section 17(a)) or in connection with the purchase and sale of a security (Section 10(b) and Rule 10b–5); (3) with the requisite mental state. *SEC v. U.S. Funding Corp.*, No. 02-cv-2089, 2006 WL 995499, at *4 (D.N.J. Apr. 11, 2006); *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 453 (3d Cir. 1997); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997). For claims under Section 17(a)(1) and Rule 10b-5, the mental state element requires a showing of scienter; for claims under Section 17(a)(2) and (a)(3), either scienter or negligence will suffice. *Aaron v. SEC*, 446 U.S. 680, 702 (1980).

(Doc. 10 at 11-12). The Complaint contains a litany of specific allegations that Defendants made false statements to prospective investors in enticing them to buy promissory notes, including that KFS was licensed to lend in multiple states and that KFS operated "mortgage net branch offices" in multiple states and that these offices generated specified amounts in mortgage loans per month. (Doc. 1 ¶¶ 32-37). The Complaint also alleges that Defendants provided "false and contradictory income statements" for KFS, made "false and unreasonable revenue and profit projections," and made false representations or material omissions regarding the use of investor funds. (*Id.* ¶¶ 38-56). The Complaint alleges that Defendants knowingly, recklessly, or negligently made these unlawful representations. (*Id.* ¶¶ 67-68, 76-81).

9

Turning next to the *Chamberlain* factors, the first factor regarding prejudice to the SEC if default is denied weighs in favor of the SEC. Absent the default judgment, the SEC will be faced with an indefinite, and possibly permanent, delay in the adjudication of its claims and is left with no alternative means to vindicate its claims against the defaulting parties, including obtaining the monetary relief it alleges it is owed.

As to whether Defendants appear to have a litigable defense, this factor also weighs in favor of the SEC. "The showing of a meritorious defense is accomplished when 'allegations of defendant's answer, if established on trial, would constitute a complete defense to the action.'" *$55,518.05 in U.S. Currency*, 728 F.2d at 195 (citing *Tozer v. Charles A. Krause Milling Co.*, 189 F.2d 242, 244 (3d Cir. 1951); *Farnese v. Bagnasco*, 687 F.2d 761, 764 (3d Cir. 1982)). In the present action, no Defendant has filed an answer or performed any other action to defend the case or set forth any meritorious defenses.

Finally, the third factor, whether Defendants' delay is due to culpable conduct, also weighs in favor of the FTC. "In this context culpable conduct means action taken willfully or in bad faith." *Gross v. Stereo Component Sys., Inc.*, 700 F.2d 120, 123-24 (3d Cir. 1983). Defendants have been on notice of this action since, at the very latest, June 14, 2017, when they signed waivers of the service of summons. (*See* Doc. 3, Doc. 4). Thus, the defendants have failed to respond or take any other action to defend this lawsuit for close to two years. At minimum, this lack of action amounts to deliberate and willful conduct.

### B. THE PROPOSED INJUNCTIVE AND MONETARY RELIEF SHALL BE GRANTED.

The SEC seeks entry of final judgments against Defendants imposing permanent injunctions prohibiting the kinds of violations of the federal securities laws challenged in the Complaint and ordering that Defendants are jointly-and-severally liable for disgorgement of ill-gotten gains along with prejudgment interest and a civil penalty equal to the amount of disgorgement. (Doc. 9-2, Doc. 9-3). Pursuant to the Federal Rules of Civil Procedure, a Court "may conduct hearings or make referrals . . . when, to enter or effectuate judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." Fed. R. Civ. P. 55(b)(2). The Court is satisfied that the briefing and supporting declarations submitted by the SEC in support of its motion for entry of default judgment, in addition to the uncontroverted factual allegations in the Complaint, obviate the need for a hearing or referral and demonstrate the propriety of the SEC's proposed final judgments.

The Securities Act, 15 U.S.C. § 77t(b), and the Exchange Act, 15 U.S.C. § 78u(d), authorize the SEC to seek and obtain permanent injunctions in federal court for violations of those laws. A court considers whether, absent a permanent injunction, a defendant will reengage in illegal conduct. *SEC v. Bonastia*, 614 F.2d 908, 912 (3d Cir. 1980). In making this determination, "courts have looked to, among other things, the degree of scienter involved on the part of the defendant, the isolated or recurrent nature of the infraction, the defendant's recognition of the wrongful nature of his conduct, the sincerity of his assurances

against future violations, and the likelihood, because of defendant's professional occupation, that future violations might occur." *Id.*

The SEC's case against Defendants outlines what was essentially a Ponzi scheme operated from at least May 2012 through January 2014 that resulted in hundreds of thousands of dollars in losses to unsophisticated investors and that was perpetrated through numerous and serious false representations intended to convince prospective investors that a sham mortgage business was a legitimate investment opportunity. Krimm himself took $500,000 from investor funds to line his own pockets. (Doc. 1 ¶¶ 53-54, Doc. 11 ¶ 135). Defendants have not responded to the Complaint and have made no representations to the Court that indicate that future violations of the law are unlikely. In these circumstances, the Court finds it appropriate to issue permanent injunctive relief enjoining Defendants from violating the Securities Act and the Exchange Act in the future, which is proper in cases of this nature. *See, e.g., SEC v. Infinity Grp. Co.*, 212 F.3d 180, 184 (3d Cir. 2000) (affirming permanent injunction prohibiting future violations of federal securities laws in a Ponzi scheme case); *SEC v. Stinson*, No. 10-cv-3130, 2011 WL 2462038, at *6 (E.D. Pa. June 20, 2011) (imposing permanent injunction in Ponzi scheme case).

The SEC's requested amount of joint-and-several monetary relief against Defendants in the form of disgorgement, prejudgment interest, and civil penalties is also

appropriate.[1] Disgorgement of ill-gotten gains, with the purpose of preventing unjust enrichment and deterring others from violating the law, is an available remedy in SEC enforcement actions. *SEC v. Teo*, 746 F.3d 90, 105 (3d Cir. 2014). Disgorgement is calculated by determining the total proceeds retained by Defendants that must be supported by an evidentiary showing from the SEC and is subject to rebuttal by Defendants. *Id.* Here, the SEC has provided a detailed declaration of an SEC staff accountant who examined Defendants' financial records and who states that Defendants took in $1,702,950 from investors and repaid $789,413 to those investors, resulting in a net investor loss of $913,537. (Doc. 11 ¶ 134). In the absence of any rebuttal from Defendants, the Court will accept this figure as the amount of disgorgement that should be awarded to the SEC.

Likewise, the Court will accept the SEC's calculation of prejudgment interest of $161,277, which is within the Court's discretion to award. *Teo*, 746 F.3d at 109-110 (explaining that award of prejudgment interest in an SEC federal court action was appropriate and "consistent with [the SEC's] own regulation" regarding such an award in an SEC administrative action, 17 C.F.R. § 201.600); (Doc. 11 ¶ 139 (explaining calculation of prejudgment interest by applying IRS underpayment rate on an individual investor basis)).

---

[1] Joint-and-several liability for monetary relief is appropriate here because the SEC has sufficiently shown that KFS was controlled and operated only through Krimm. (Doc. 1 ¶¶ 11-12, 18-19, 57, 68); *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir. 1997) ("[J]oint-and-several liability is appropriate in securities cases when two or more individuals or entities collaborate or have close relationships engaging in the illegal conduct.").

13

Finally, the Court will order Defendants to pay the SEC's requested civil penalty in the amount of disgorgement, $913,537. As set forth by the SEC in its brief in support of its motion for entry of default judgment, the Securities Act, 15 U.S.C. § 77t(d)(2)(C), and the Exchange Act, 15 U.S.C. § 78u(d)(3)(B), provide for the awarding of civil penalties in certain cases. (Doc. 10 at 18). The highest level of civil penalties, "third tier" civil penalties, are available when the unlawful conduct (1) "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and [(2)] such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B). Third tier civil penalties can be awarded in an amount equal to the amount of disgorgement, and is proper in cases when it may be difficult to determine the exact number of violations. *SEC v. Graulich*, No. 09-cv-4355, 2013 WL 3146862, at *7 (D.N.J. June 19, 2013). The Court finds such an award is warranted here, given the egregious nature of Defendants' scam and the amount of harm caused to investors.

## V. CONCLUSION

For the foregoing reasons, the Court will grant the SEC's motion for entry of default judgment (Doc. 9) and enter default judgment in the amount of $913,537 in disgorgement, $161,277 in prejudgment interest, and a civil penalty in the amount of $913,537.

A separate Order and final judgments against Defendants follow.

/s/ Robert D. Mariani
Robert D. Mariani
United States District Judge